**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z. GLANCY #134180
MICHAEL GOLDBERG #188669
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel for Plaintiff Business Systems*
*Consultants, Ltd.*

[Additional Counsel on Signature Page]

FILED

09 MAY -6 PM 4:29

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____  DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUSINESS SYSTEMS CONSULTANTS, LTD., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SEQUENOM, INC., HARRY STYLLI, PAUL HAWRAN, ALLAN BOMBARD, CHARLES R. CANTOR and ELIZABETH DRAGON, <br><br> Defendants. | Civil Action No. **09 CV 976 BEN    RBB** <br><br> **FEDERAL SECURITIES CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

FEDERAL SECURITIES CLASS ACTION COMPLAINT

Plaintiff Business Systems Consultants, Ltd., ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its Class Action Complaint against defendants, alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, Securities and Exchange Commission ("SEC") filings, and press releases published by and regarding Sequenom, Incorporated ("Sequenom" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a securities fraud class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC against the Company and certain of its top officials and is brought on behalf of all persons or entities who purchased or otherwise acquired Sequenom securities between June 4, 2008 and April 29, 2009, inclusive (the "Class Period"), and who were damaged thereby.

2.      During the Class Period, Defendants issued public statements concerning the Company's "crown jewel" - SeQureDx Down syndrome test

1  ("SEQureDx") which is intended to detect Down syndrome in the first trimester of a

2  pregnancy. Defendants consistently reported that clinical results concerning the test

3

4  trials for the product were extremely favorable, with 100% detection and no false

5  positives, compared to only 70-90% detection and 5% false positives in current tests,

6

7  and that the product would be ready for launch by June 2009.

8          3.      Defendants' public statements were false and/or failed to disclose

9

10 material adverse information, *i.e.*, (1) Sequenom employees "mishandled" test data

11 and results regarding SEQureDx clinical trials; (2) the results actually indicated that

12

13 SEQureDx did not offer verifiable, statistically significant improvement over

14 competing tests; and (3) due to undisclosed problems with the clinical tests data and

15

16 results, Sequenom would be unable to bring SEQureDx to the market by June 2009.

17         4.      On April 29, 2009, after the market closed, Sequenom revealed that its

18 employees had "mishandled" the test results and data for the Company's

19

20 SEQureDx, and that the commercial launch of the test would be delayed. Also, the

21 Company disclosed that (1) it was suspending four employees; (2) it was forming a

22

23 Special Committee of the Company's Board of Directors to investigate

24 wrongdoing; (3) its previous press releases and SEC filings concerning SEQureDx

25 could no longer be relied upon; and (4) it was reviewing the test results for all of its

26

27 products, not just SEQureDx.

28         5.      As a result, Sequenom stock price fell $11.29 or more than 75%, on

extremely high trading volume of over 88 million shares.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.      The Court has personal jurisdiction over this action because Sequenom does business in this District and its stock trades on the NASDAQ Stock Market ("Nasdaq") which is an efficient market, under the symbol "SQNM."

9.      In connection with the challenged conduct, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiff

10.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Sequenom securities at artificially inflated prices during the Class Period and was damaged thereby.

## Defendants

11.    Defendant Sequenom is a Delaware corporation with its principal executive offices located at 3595 John Hopkins Court, San Diego, CA 92121. Sequenom has approximately 58.25 million shares outstanding.

12.    Defendant Harry Stylli ("Stylli") was, at all relevant times, President and Chief Executive Officer ("CEO") of Sequenom and a director of the Company since June 2005.

13.    Defendant Paul Hawran ("Hawran") was, at all relevant times, Chief Financial Officer of the Company.

14.    Defendant Allan Bombard ("Bombard") was, at all relevant times, Chief Medical Officer of the Company.

15.    Defendant Charles R. Cantor ("Cantor") was, at all relevant times, Chief Scientific Officer of the Company.

16.    Defendant Elizabeth Dragon ("Dragon") was, at all relevant times, Senior Vice President, Research and Development of the Company.

17.    The defendants named in ¶¶ 12 - 16 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Sequenom, incorporated in 1994, is a diagnostic testing and genetics

analysis company. The Company is focused on providing products, services, diagnostic testing, applications and genetic analysis products that translate the results of genomic science into solutions for biomedical research, translational research, molecular medicine applications, and agricultural, livestock and other areas of research. Its development and commercialization efforts in various diagnostic areas include non-invasive prenatal diagnostics, oncology infectious diseases and other disorders. The Company is researching, developing and pursuing the commercialization of various non-invasive molecular diagnostic tests for prenatal genetic disorders and diseases, oncology, infectious diseases, and other diseases and disorders.

**Defendants' False and Misleading Statements**

19.     On June 4, 2008, the Company issued a press release entitled, "Sequenom Announces Results of Screening Studies for Down Syndrome and Updates Development of Noninvasive Prenatal Diagnostics at Analyst and Investor Briefing." The release stated the following in relevant part:

> The Company reported that in blinded studies performed at Sequenom involving approximately 200 clinical samples collected both prospectively and retrospectively, its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). Population coverage for the T21 test improved to at least 93% of the U.S. population. With currently available serum-testing options having detection rates between 70% to 90% and false-positive

rates as high as 5%, SEQureDx Technology shows promise for significant performance advantages over the current paradigms for prenatal screening. The Company expects to continue its development activities through the end of 2008, at which time the Company will initiate transfer of the technology to laboratory partners. The Company plans to initiate a multi-site validation study consisting of several thousand samples in the fourth quarter this year and launch its Down syndrome test as a Laboratory Developed Test (LDT) in the U.S. in the first half 2009.

"We are very pleased to be reporting substantial progress toward commercializing an important test to screen for Down syndrome that can be administered as early as late in the first trimester through a simple blood draw from the mother," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "Data from our blinded screening study for the detection of fetal aneuploidy indicate that the current version of our test has identified all Down syndrome samples without any false-positive outcomes. Also our coverage has improved to at least 93% of the U.S. population. Although these results require further ' validation in larger studies, such results using SEQureDxTM Technology can potentially transform current clinical practice for Down syndrome-risk assessment."

The studies conducted both prospectively and retrospectively, involved approximately 200 samples in both normal and high-risk patients. The blinded-prospective study involved 180 samples comprising 130 low-risk and 50 high-risk samples. The test correctly identified three Down syndrome samples without any false-positive outcomes. Of the 21 blinded samples analyzed retrospectively, the test correctly identified seven Down syndrome samples while also indicating no false-positive results.

20.    On or about June 26, 2008, the Company priced its Secondary Offering of 5,500,000 shares of its common stock at a public offering price of $15.50 per share and that underwriters had a 30-day option to purchase up to an

additional 825,000 shares of common stock to cover over-allotments. The Company was able to raise net proceeds of over $92 million by selling approximately 5.5 million shares.

21.     In connection with the Offering, the Company filed a Registration Statement and Prospectus on June 23, 2008, as supplemented on June 26, 2008 (collectively referred to herein as the "Registration Statement") with the SEC. The Registration Statement stated in relevant part:

> "We are also developing a test for Trisomy 21 (Down syndrome). We plan to initially commercialize the test as a LDT through laboratory partners in the first half of 2009, and then through our CLIA laboratory following acquisition or build-out...."

22.     On July 30, 2008, the Company issued a press release reporting its second quarter 2008 financial results. The press release stated in relevant part:

> "We have taken major steps toward the introduction of our noninvasive prenatal test for Down syndrome, based on our SEQureDx(TM) technology," commented Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "On June 3 at the International Society of Prenatal Diagnostics conference in Vancouver, we announced study results involving 200 normal and high-risk samples. The results showed that we correctly identified all Down samples, with no false-positives. This compares to current screening tests that have detection rates of 70% to 90% with approximately 5% false-positives. We are currently focused on analyzing first trimester samples to validate the applicability of our Down syndrome test for first trimester screening.

23.     On September 23, 2008, Sequenom issued a press release entitled, "Sequenom Announces Additional, Positive Results for Down Syndrome Test at Analyst Briefing." The press release stated in relevant part:

> Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 219 new clinical samples collected prospectively, showing that its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). The SEQureDx prototype test also demonstrated its ability to correctly identify a Down syndrome positive sample in the first trimester, confirmed by chorionic villus sampling (CVS), a current testing standard that requires the harvesting of placental tissue cells.

> Sequenom indicated that with the addition of new SNPs in PLAC4 and a recently discovered gene, the SEQureDx Trisomy 21 test should increase its coverage from 93% to greater than 95% in the US population. The Company has also identified novel markers for Trisomy 18 that have passed its initial selection criteria, and other chromosomes, and intends to develop these markers into new tests.

> The Company expects to continue its current development activities through the end of 2008, at which time the Company will initiate a multi-site 3,000 to 5,000-sample laboratory developed test (LDT) validation study, which is expected to be completed and submitted for publication at the time of the anticipated commercial launch in June 2009.

24.     On October 30, 2008, Sequenom issued a press release announcing its 2008 third quarter financial results. The press release stated in relevant part:

> "During the third quarter we rapidly advanced our paradigm-shifting approach to Down syndrome screening and reinforced

FEDERAL SECURITIES CLASS ACTION COMPLAINT                                        8

our significant leadership in the noninvasive prenatal diagnostics space," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Specifically, we announced complete clinical concordance with the results from our Trisomy 21 technology in more than 400 maternal blood samples analyzed to date. In addition, we secured additional intellectual property to further enhance our already significant proprietary position in noninvasive prenatal diagnostics, and we signed a definitive agreement to acquire the Center for Molecular Medicine (CMM), a state-of-the-art CLIA-certified laboratory. Upon completion of the CMM acquisition, CMM will be positioned to launch RHD and Fetal (XY) tests in the first quarter of 2009, followed by the Trisomy 21 test by mid-year. We look forward to continuing this progress in the quarter and year ahead."

***

2008 Third Quarter and Recent Highlights

-- Further Positive Results from Down Syndrome Screening Study: In late September Sequenom announced additional positive results from screening studies for detection of fetal aneuploidy, including Down syndrome, from maternal blood using Sequenom's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx Technology. At the Analyst and Investor Briefing, Sequenom presented data demonstrating complete concordance with clinical results (no false positives and no false negatives) in both first and second trimester samples from an additional 200 (400 in total) prospective samples.

25.     On December 1, 2008, the Company issued a press release entitled, "Next-Generation Noninvasive Diagnostic Technology Shown to Accurately

Detect Fetal Down Syndrome in First Trimester of Pregnancy." The press release stated in relevant part:

> This study used massively parallel genomic sequencing to quantify maternal plasma DNA sequences for the noninvasive prenatal detection of Down syndrome, assessing samples from 28 women in the first and second trimesters of pregnancy. All 14 Down syndrome fetuses and normal fetuses were correctly identified at these early stages.

26.     On January 28, 2009, the Company issued another press release entitled "Sequenom Announces New Positive Data on Down Syndrome Detection and Unveils Breakthrough DNA Approach to Prenatal Diagnostics." The press release stated in relevant part:

> •     Sequenom, Inc today announced new positive data from the prospective clinical studies using the Company's noninvasive SEQureDx™ technology, enabling the detection of fetal aneuploidy from maternal blood. The data presented today consist of 459 new, high prevalence samples from the prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. Based on the results from the total study samples, including samples as early as 8 weeks of pregnancy, the Sequenom SEQureDx RNA-based technology demonstrated a 100% positive predictive value (PPV) and a 99.9% negative predictive value (NPV). The SEQureDx technology achieved a better than 99% detection rate, with less than a 1% false positive rate. The current standard of care, screening tests, perform at less than a 99% detection rate; however, statistically, if these screening tests could perform at a 99% detection rate, their false positive rate would be in the 10% to 25% range. SEQureDx compares favorably to the current invasive procedures, such as amniocentesis.

27.   On February 3, 2009, the Company issued a press release entitled, "Sequenom Announces Findings on Methylation Markers and RNA-SNP Markers as Presented at SMFM." The press release stated in relevant part:

### Additional Data from Screening Studies Evaluating RNA-based SEQureDx Trisomy 21 Technology

During an analyst and investor briefing held concurrently with the SMFM meeting, Sequenom presented new data evaluating its prenatal screening technology for Down syndrome. The data presented consisted of 459 new samples from prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. The test correctly identified all 22 T21 positive samples from the 459 new samples including eight first-trimester and 14 second-trimester Down syndrome samples (*i.e.* 100% sensitivity or detection rate) with one false positive and no false negatives, as confirmed by chorionic villus sampling (CVS) and amniocentesis. The DNA-based method correctly detected the one homozygous sample that the RNA-based method did not resolve (i.e., that had been deemed a "no-call").

A summary of the results for the 459 new samples including samples as early as 8 weeks of pregnancy are as follows:

- Specificity of 99.7% (98.4% - 100%) and 100% sensitivity (85.1 – 100%) at a 95 % confidence interval;
- The Positive Predictive Value is 95.6% (79.0% -99.8%) and the Negative Predictive Value of 100.0% (98.9% - 100%) at a 95% confidence interval;
- The SEQureDx RNA test had a total of 85 unresolved results ("no-calls") due to homozygotes (80) and unacceptably low RNA levels (5) for a total of 18.5%. The DNA-based method analyzed 68 of the homozygote "no-calls" and all were successfully resolved;
- The distribution of the 459 samples actually collected as compared to the expected rate in the U.S. population was

Caucasian (282 vs. 307), Asian (101 vs. 20), African American (12 vs. 62) Hispanic (62 vs. 68) and Native American (2 vs. 3).

"We are pleased with the progress of our research efforts and look forward to transferring the technology to our CLIA facility soon for commercial launch in June," said Dr. Betty Dragon, Senior Vice President Research & Development. "We are confident that our no call rate for homozygote samples will improve as the patient population increases and the ethnic distribution normalizes. We expect that in the final test, ethnic coverage will be better than 95% of the U.S. population. Identification of additional SNPs by ongoing sequencing of the relevant genes of homozygote patients, coupled with modest improvements in marker recovery, will further expand the ethnic coverage of the RNA-based test."

"Furthermore, when compared to amniocentesis or CVS, the new DNA-based method correctly identified all 68 homozygotes tested including a no-call T21 sample and a no call T18 sample. The DNA-based test shows great promise as a reflex to the RNA method or potentially as a front-line test in its own right," added Dr. Dragon.

Based on the results from the 858 total study samples, the Sequenom SEQureDx RNA-based technology demonstrated:

- Specificity of 99.9% (99.2% - 100.0%) and 100% sensitivity (87.9% - 100.0%) at a 95% confidence interval;
- The Positive Predictive Value is 96.6% (82.8% -99.8%) and the Negative Predictive Value of 100.0% (99.5% - 100%) at a 95% confidence interval;
- The SEQureDx RNA test had a total of 106 unresolved results ("no calls") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. The DNA-based method, when applied, resolved all no calls;
- SEQureDx is considerably more accurate than commonly employed standard-of-care screening tests, which perform at a 70%-90% detection rate (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even compares favorably to

current invasive procedures, such as amniocentesis (which has sensitivity and specificity of approximately 99.5%).

28.    On February 11, 2009, the Company issued a press release announcing its fourth quarter and year end 2008 financial results. The press release stated in relevant part:

> "This past year was pivotal for Sequenom as we continued to advance our genetic analysis and molecular diagnostics businesses," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "We accomplished many key milestones over the last 12 months and are well-positioned for the launch of our SEQureDx™ Down syndrome technology in June. The data reported from our R&D study containing 858-patient samples clearly shows that our SEQureDx screening technology is considerably more accurate than the current standard-of-care screening technology, and even compares favorably against current invasive procedures....
>
> ***
>
> **Early 2009 Highlights**
>
> •    *Announced Additional Positive Results from RNA Down Syndrome Screening Study and Unveiled Breakthrough DNA Approach to Prenatal Diagnostics*: Earlier this year, Sequenom announced positive data regarding the performance of its Down syndrome test, including data from 459 new, high-prevalence patient samples, bringing the total number of patient samples studied to 858. Based on the results from total study samples, including samples obtained as early as eight weeks of pregnancy, Sequenom's SEQureDx RNA-based technology demonstrated a 96.6% positive predictive value (PPV) and a 100% negative predictive value (NPV).

29.    On March 12, 2009, the Company filed its annual report on Form 10-K for the year ended December 31, 2008, which was signed by defendants Stylli

and Hawran. The Form 10-K also included certifications by defendants Stylli and Hawran. The Form 10-K represented that:

> Based on the results from the 858 total study samples, our SEQureDx RNA-based technology demonstrated:
>
> • Specificity of 99.9% (99.2%–100.0%) and 100% sensitivity (87.9%–100.0%) at a 95% confidence interval;
>
> • The Positive Predictive Value is 96.6% (82.8%–99.8%) and the Negative Predictive Value of 100.0% (99.5%–100%) at a 95% confidence interval;
>
> • The SEQureDx RNA test had a total of 106 unresolved results ("inconclusives") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. (The DNA-based method, when applied, resolved the no calls of those samples which could be tested);
>
> "Specificity" is the probability that the test will be negative if the patient does not have the disease or condition. "Sensitivity" is the probability that the test will be positive if the patient has the disease or condition. "Positive Predictive Value" is the probability that a patient has the disease or condition when his/her test is positive. "Negative Predictive Value" is the probability that a patient does not have the disease or condition when his/her test is negative. The ranges in parentheses are 95% confidence intervals which represent the statistical uncertainty associated with the results based on the sample data.

30. The foregoing statements were each materially false and/or misleading when made as they misrepresented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading including, in particular that, (1) Sequenom employees

"mishandled" test data and results regarding SEQureDx clinical trials; (2) the results actually indicated that SEQureDx did not offer verifiable, statistically significant improvement over competing tests; and (3) due to undisclosed problems with the clinical test data and results, Sequenom would be unable to bring SEQureDx to the market by June 2009.

**The Truth Emerges**

31.    On April 29, 2009, Sequenom shocked the investing public by announcing that the Company's employees had mishandled SEQureDx Down Syndrome test data and results, and that the Company's press releases and SEC filings going back to June 4, 2008 could no longer be relied upon. Specifically, the press release stated:

> SEQUENOM, Inc. announced today that the expected launch of its SEQureDx™ Down syndrome test is delayed, due to the discovery by company officials of employee mishandling of R&D test data and results. Accordingly the company is no longer relying on the previously announced R&D test data and results. SEQUENOM has not changed its plans to develop in parallel its RNA- and DNA-based methods for the Down syndrome test and will endeavor to have a validated test in the fourth quarter of 2009. Under the circumstances, and as supported by key clinical opinion leaders, the company now intends to launch the Down syndrome test upon publication in a peer-reviewed journal of the results from the on-going large, independent clinical studies, which are designed to be practice-changing for Down syndrome testing.

> The company's board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data

and results. The committee has engaged independent counsel to assist the committee in the conduct of the investigation.

Although the company is not aware of any potentially inappropriate activity related to the reported results of its other tests under development, the company is currently reviewing the data for all tests. As a result of this ongoing review the Rhesus D, Cystic Fibrosis and Fetal'' tests are now anticipated to begin launching in the third quarter of this year.

The company believes that its Down syndrome program has suffered a temporary setback but that the SEQureDx technology is scientifically and technically sound. The company intends to take every possible action to make up lost ground. SEQUENOM believes that it has the financial resources to commercialize its test for Down syndrome and other prenatal disorders.

Today's announcement regarding the company's SEQureDx Down syndrome R&D test data and results supersedes all previous announcements about such data and test, including its press releases dated June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009 and February 3, 2009.

32.   During a conference call on that day, defendant Stylli stated that the Company's "R&D study data associated with the Down Syndrome Assay was mishandled by individuals" which raised "a significant concern regarding the integrity of that data." As a result, the Company "suspended four individuals and put a new team in place to oversee the R&D studies to our prenatal diagnostics." Further, analysts repeatedly asked Defendants Stylli and Hawran for details. For example, analyst Jerry Kalmatos asked: "Were there mistakes made scientifically on the assay part of it? Or do you think data was falsified on purpose? What

exactly do you think happened? Instead of providing critical details, Defendant Stylli said the following: "I would to answer those questions, but again, I've got to respect the other committee until in concludes its analysis."

33.   In a Reuters article, several analysts commented on the revelations. Brean Murray Carret and Co. analyst Jonathan Aschoff who calls the Down Syndrome test the Company's "crown jewel" said that he did not "believe the product will ever launch" because there is serious doubt "that a timeline can be put forth when all of the RNA and DNA data generated to date is now questionable." Similarly, the Reuters article noted that "[a]ny review will now be subject to a higher level of scrutiny and therefore will be more thorough and take longer to be signed off on before it can be published," according to Collins Stewart analyst Keay Nakae.

34.   As a result, the stock fell $11.29 or over 75% and closed at $3.62 on April 30, 2009, on extremely heavy trading volume of more than 88 million shares traded.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons or entities who purchased Sequenom securities between June 4, 2008 and April 29, 2009, inclusive and who were damaged thereby.  Excluded from the Class are defendants herein,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

36.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Sequenom securities were actively traded on Nasdaq, an open and efficient markets.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Sequenom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations and management of Sequenom;

- whether the Individual Defendants caused Sequenom to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the market prices of Sequenom during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

41.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the securities of the Company traded in an efficient market;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased their Sequenom securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

42.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

43.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sequenom securities; and (iii) cause Plaintiff and other members of the Class to purchase Sequenom securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

46.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, and press releases designed to influence the market for Sequenom securities.  Such reports, filings, and releases were materially false and misleading in that they failed to disclose

material adverse information and misrepresented the truth about Sequenom's finances and business prospects.

47.   By virtue of their positions at Sequenom, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.   Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

48.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sequenom.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sequenom's businesses, operations, future financial condition and future prospects.   As a result of the dis-semination of the aforementioned false and misleading reports and releases, the

market price of Sequenom securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Sequenom's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Sequenom securities at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by defendants and were damaged thereby.

49.   During the Class Period, Sequenom securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased Sequenom securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Sequenom securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Sequenom securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

50.   By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Sequenom securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

52.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53.     (a)     During the Class Period, the Individual Defendants participated in the operation and management of Sequenom, and conducted and participated, directly and indirectly, in the conduct of Sequenom's business affairs.  Because of their senior positions, they knew that the adverse facts specified herein had not been disclosed to and were actively hidden from shareholders.

(b)     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sequenom's financial condition and results of operations, and to correct promptly any public statements issued by Sequenom which had become materially false or misleading.

(c)     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sequenom disseminated in the marketplace during the Class Period concerning Sequenom's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sequenom to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Sequenom within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sequenom securities.

54.     Each of the Individual Defendants, therefore, acted as a controlling person of Sequenom.  By reason of their senior management positions and/or being directors of Sequenom, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause Sequenom to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of Sequenom and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

55.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sequenom.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative and Lead Plaintiff;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

///

# DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated: May 6, 2009

RESPECFTULLY SUBMITTED,

**GLANCY BINKOW
& GOLDBERG LLP**

By: _____
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff*

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
MARC I. GROSS
JEREMY A. LIEBERMAN
FEI-LU QIAN
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
PATRICK V. DAHLSTROM
One North LaSalle Street, Suite 2225
Chicago, Illinois  60602
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184

1  Of Counsel:

2  **POMERANTZ HAUDEK**

3  **GROSSMAN & GROSS LLP**

   MARC I. GROSS

4  JEREMY A. LIEBERMAN

5  FEI-LU QIAN

   100 Park Avenue, 26th Floor

6  New York, New York 10017

7  Telephone: (212) 661-1100

8  Facsimile:  (212) 661-8665

9  **POMERANTZ HAUDEK**

10 **GROSSMAN & GROSS LLP**

   PATRICK V. DAHLSTROM

11 One North LaSalle Street, Suite 2225

12 Chicago, Illinois  60602

13 Telephone: (312) 377-1181

   Facsimile:  (312) 377-1184

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Certification of Plaintiff
## Pursuant to Federal Securities Laws

1.  I, P M Schreiber *J G Howitt*, on behalf of Business Systems Consultants, Ltd. ("BSC") make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.  I have reviewed a Complaint against Sequenom, Inc. ("SQNM") and authorize a filing of a comparable complaint on my behalf.

3.  BSC did not purchase SQNM securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.  BSC is willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action and that the Pomerantz Firm will exercise its discretion in determining whether to move on BSC's behalf for appointment as lead plaintiff.

5.  To the best of my current knowledge, the attached sheet lists all of BSC's purchases and sales in SQNM securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this certification is signed, BSC has not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  BSC agrees not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.  The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

Executed __5 May 2009__ , at __Martello Court, Admiral Park, St Peter Port, Guernsey__
(Date)                          (City, State) FOR BUSINESS SYSTEMS CONSULTANTS LTD

_(signature)_
(Signature) For COSIGN SERVICES LIMITED
            Authorised Signatory
            Director

_(signature)_
Authorised Signatory
For SPREAD SERVICES LIMITED
Director

__J G Howitt__                    P M Schreibke
(Type or Print Name)

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

FILED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

09 MAY -6 PM 4:31

## I. (a) PLAINTIFFS

BUSINESS SYSTEMS CONSULTANTS, LTD., Individually and on Behalf of All Others Similarly Situated

## DEFENDANTS

US DISTRICT COURT

SEQUENOM, INC., HARRY STYLLI, PAUL HAWRAN, ALLAN BOMBARD, CHARLES R. CANTOR and ELIZABETH DRAGON

(b) County of Residence of First Listed Plaintiff   Great Britain
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   DEPUTY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Michael Goldberg, Glancy Binkow & Goldberg LLP
1801 Ave. of the Stars, #311 Los Angeles, CA 90067 T: 310/201.9150

Attorneys (If Known)

'09 CV 976 BEN   RBB

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability
PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 15 U.S.C. §§ 78j(b) and 78t
Brief description of cause: Violations of Securities Exchange Act

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☑ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE   William Q. Hayes   DOCKET NUMBER   09-cv-0949

DATE   05/06/2009
SIGNATURE OF ATTORNEY OF RECORD   Michael Goldberg

FOR OFFICE USE ONLY

RECEIPT #   AMOUNT   350.-   APPLYING IFP   JUDGE   MAG. JUDGE

5/6/09

cR

DUPLICATE

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS000506
Cashier ID: sramirez
Transaction Date: 05/06/2009
Payer Name: ALPHA ATTORNEY SERVICE
-----------------------------------
CIVIL FILING FEE
 For: BUSINESS SYSTEMS V. SEQUENOM
 Case/Party: D-CAS-3-09-CV-000976-001
 Amount:       $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 13310
 Amt Tendered:  $350.00
-----------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.